Argued February 7, affirmed May 31, 1962

# KLIMEK *v.* PERISICH
### 371 P. 2d 956

*Morton A. Winkel* and *Justin N. Reinhardt,* Portland, argued the cause for appellant. With them on the brief were Reinhardt, Coblens & Stoll, Portland.

*F. Leo Smith,* Portland, argued the cause and filed a brief for respondent.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY, GOODWIN and LUSK, Justices.

PERRY, J.

This is an action brought by the plaintiff to recover damages from the defendant for breach of contract to remodel an old dwelling house into a rooming house.

The jury returned a verdict for the plaintiff which was set aside and judgment entered notwithstanding the verdict for the defendant. The plaintiff has appealed.

The sole question presented is, was a contract entered into between the defendant and plaintiff whereby defendant contracted to fully remodel an old residence into a suitable rooming house for plaintiff at a sum not to exceed $10,000?

Both plaintiff and defendant were born in Yugoslavia, and while they now speak and understand English, the record discloses limitations in this regard. The record discloses that plaintiff's husband, who had been a building contractor for some twenty years in this country, died. Subsequent to his death the plaintiff left her home in Newberg and sought employment in Portland.

Through a Portland real estate dealer, who had been instrumental in selling a farm owned by the plaintiff, the plaintiff purchased an old residence in Portland with the thought of remodeling it into a rooming house. This real estate dealer, knowing of her Yugoslavian background, introduced her to the defendant, a builder in Portland. The plaintiff and defendant went to look at the premises, and this conversation took place:

"Q (By Mr. Reinhardt) When you showed this building to Mr. Perisich, what did you ask him about the building?

"A Well, I said, 'Mr. Perisich, I plan to have a rooming house, do you know how many rooms I could have, what I could have from this house?' And he said, 'I couldn't tell you that,' he said, 'but I can do nothing without blueprints. If you get an architect, I take you to architect,' he said, 'and he design and then we see what you can do.' And I said to Mr. Perisich, 'How much that will cost me, what do you think?' And that was the same day, I think. And I said, 'How much will it cost me all together,' and he said, 'Well, it will run around eight, nine, ten thousand dollars, not any more.' "

Plaintiff also testified as follows:

"Q Now, did you have any discussion with Mr. Perisich about what he was to do for you about this house?

"A No. I don't because I don't understand a

thing of the building. I just give it up to him and he say he try to do it cheapest for me what he can. He say even that will not cost you that much. And he said, 'When you not working, if you find somebody cheaper than I can find, all right, then you contact this person. If I find somebody cheaper, we take this one.'

"Q Did Mr. Perisich at any time ever make any definite agreement with you about—

"MR. SMITH: I object to that.

"THE COURT: That will have to be the result of conversations. There is only two ways an agreement can be formed, by a written contract or what was said. You will have to limit it to that.

"Q (By Mr. Reinhardt) Did Mr. Perisich at any time tell you what he would do for you in connection with this remodeling?

"A No, he never asked me. He just do his work. Then when somebody come around, the siding, he had one and he give him a figure for $35,000, and I look in the paper and I see different people who put on siding and they make for me, I think, $2400.

"Q You said $35,000. Do you mean $3500?

"A $3500."

Blueprints for the remodeling were obtained but no specifications covering materials to be used were ever drafted by anyone.

As to the time the blueprints arrived, plaintiff testified as follows:

"A When he had the blueprints, he told me that the blueprint came, I think it came to him, and he said he got blueprint, and I said, 'Go ahead and you can do this amount what you tell me, eight, nine thousand.' And he says, 'Yes,' and he said, 'Maybe cheaper some.'

"Q And then you told him to go ahead and do the work?

"A Yes."

The plaintiff introduced numerous checks to various workmen and lumber dealers showing she paid directly some of the workmen and suppliers. She paid defendant carpenters wages, as she did two other carpenters who worked with him on an hourly basis. With reference to one of the workmen plaintiff herself hired, she testified as follows:

"Q (By Mr. Reinhardt) How did Mr. Washington happen to do work at the place, Mrs. Klimek?

"A He come and tore the plaster off.

"Q Who asked him to come and tear the plaster off?

"A I asked somebody, I could not remember who it was, and they sent him to my place and he came one morning, and he said, 'You was the lady who need the labor to tear the plaster off?' And I said, 'Yes,' and I asked him how much will he charge and he said he going to charge me $600, but then he work just a short time, I think two days, and quit, and then I had another one because Mr. Perisich, he said he get a guy who do that kind of work for $2400, and after all I figure out how I hire, it comes altogether at $900, tear off and take away the plaster.

"Q Did you have any discussion with Mr. Perisich about the removal of the plaster before Mr. Washington—

"A Yes.

\* \* \* \* \*

"Q (By Mr. Reinhardt) What was that conversation that you had with Mr. Perisich?

"A Well, he told me if I could find somebody to do it cheaper than he does, go ahead and take it.

"Q Do what cheaper than he can?

"A Any kind of work, anyone hire.

"Q Well, how did you know that plaster needed to be taken off of this building? Did anybody tell you?

"A Mr. Perisich, yes, that is what we spoken first.

"Q  Well now, what was the conversation between you and Mr. Perisich about taking plaster off?

"A  Well, that is the way it start, and I said, 'Well, who is going to do that?' He said, 'I have got two guys, they going to do that, they can do that work for $2400,' and I said, 'That is quite a bit of money, I think.  Can I look for somebody.' I said, 'I don't have nothing to do, I look for somebody, if I can get it cheaper,' and that is the way it starts.  And after all, I still pay too much money for that.

\*  \*  \*  \*  \*

"Q  But did you discuss each check with him before you issued it or not?

"A  No, from the start he tell me if I get anybody cheaper than what he could hire, if anybody make a lower price, all right, I should take it."

Again, as to the agreement, plaintiff testified as follows:

"Q  After you started the agreement, what was the agreement?

"A  Well, he said he going to build this house for me from eight, nine, to ten thousand most, it doesn't cost any more.

"Q  Yes.

"A  And he said, 'No, not even that much, because I am going to do the work for you as cheap as plain labor, I won't charge you any more.' And he says, 'If you know somebody, I can hire people, but if you know somebody that can do it cheaper and just as good work like I know, it is all right, you privileged to hire that fellow.'"

As to the bills, she stated:

"A  Mr. Perisich, when bills come, he give it to me."

The bills for material came direct to plaintiff, not through the defendant, and she paid the defendant his wages weekly.

The plaintiff also testified that after she discovered what remodeling of the building was costing she asked the defendant where she might obtain sufficient moneys to complete the project, and he gave her the names of several of his friends, but she was unsuccessful in this attempt. She then abandoned the project.

Again, as to the purported contract, the plaintiff testified:

"Q All right. Did he give you a statement on or about May 10th, 1957?

"A Not before and not after. I don't have any statement. He says he is going to do that building, complete finished, he agreed complete finish, and I don't ask for statement. Before we start on the building, I said, 'Mr. Perisich, you know I like if you could give me a contract or some paper writing down that you will do for that much,' and he says, 'Well, that is an old house, I couldn't tell exactly how much it will cost me, but'—

"Q (Interposing) Just a minute.

"MR. REINHARDT: Let her finish the answer.

"Q (By Mr. Smith) Are you finished?

"A And he said, 'It will cost you more by anybody else because I do for you cheapest what I do.'

"Q Now, you just said a minute ago that you asked him for a written contract but he told you it was an old house and he didn't know how much it would cost?

"A Correct.

"Q So, Mrs. Klimek, before he started to work, he told you he did not know how much it would cost?

"A Well, he said positively, it will not pass the ten thousand."

The plaintiff also testified no arrangements were made between the parties as to who would do the required plumbing, heating or electrical wiring of the structure, but as these items became necessary they would each try to have these items contracted for at the most reasonable price. Any discounts for materials the defendant could receive by reason of his vocation were passed on to plaintiff by defendant. The plaintiff also introduced into evidence an estimate of the cost of remodeling the house which defendant furnished to plaintiff before entering into work upon the house, which, including new furnace, labor, materials, etc., was of the sum of $18,284.00.

■ We have set forth only the evidence of the plaintiff, as this is an action at law, and if there is substantial evidence of the formation of a contract, as sued upon, the finding of the jury must be sustained. *Clemens v. Smith,* 170 Or 400, 402, 134 P2d 424.

■ The intention of the parties to enter into a contract and the construction of their language to express their intentions and agreement must be construed in the light of the circumstances which then existed. *Erickson v. Grande Ronde Lbr. Co.,* 162 Or 556, 92 P2d 170, 94 P2d 139.

■ To constitute a contract such as here present, there must be an offer and an acceptance. *Courteen Seed Co. v. Abraham,* 129 Or 427, 275 P 684; *Maeder Steel Products Co. v. Zanello,* 109 Or 562, 220 P 155; *Mendelsohn v. Mendelsohn,* 104 Or 281, 207 P 158; *C. R. Shaw Wholesale Co. v. Hackbarth,* 102 Or 80, 201 P 1066, reversing 102 Or 80, 198 P 908.

■ An offer must be certain so that upon an unqualified acceptance the nature and extent of the obligations of each party are fixed and may be determined

with reasonable certainty. *Medford Furniture etc. Co. v. Hanley,* 120 Or 229, 250 P 876.

As to an acceptance of an offer:

" 'It is well settled that when a contract is to be founded on offer and acceptance, it must be shown that the latter coincides precisely with the former. Unless this appears, there is no agreement: Hardy v. Sheedy, 58 Or. 195 (113 P. 1133); Hall v. Olson, 58 Or. 464 (114 P. 638); Henry v. Harker, 61 Or 276 (118 P. 205, 122 P 298); Lueddemann v. Rudolph, 79 Or. 249 (154 P. 116, 155 P. 172). The evidence of the alleged compact being all in the letters, it is the province of the court to construe them and see if they constitute a contract.' " *Northwestern Agencies v. Flynn,* 138 Or 101, 106, 5 P2d 530.

See, also, *Ellingsworth v. Shannon,* 161 Or 106, 110, 88 P2d 293; *Jackman v. Jones et al,* 191 Or 356, 229 P2d 963. In other words, there must be a meeting of the minds as to the obligations each assumes under the contract before it can be said that a contract exists.

In the matter before us the plaintiff agreed to pay money and the defendant agreed to render services, therefore both the amount to be paid and the services to be rendered must be reasonably certain.

As stated by Williston in his work on Contracts, 3d ed, § 42, p 135:

"As a promise may insufficiently specify the price to be paid, so the consideration for which the price is to be paid may be left equally uncertain, and in such a case it is not usually possible to invoke the standard of reasonableness in order to give the promise sufficient definiteness to make it enforceable. Illustrations of such indefiniteness are as follows: A promise to give the buyer of a horse in a certain contingency 'the buying of another horse'; a promise to mine and deliver all

'the outcrop' on certain lands; a reservation of 'the necessary line for making a railway', a promise to sell as many cross-ties as it is possible to accumulate at a certain point for 12 months, were held not sufficiently certain. Likewise a promise to erect buildings where the dimensions and plans are not specified, or which refers to plans and specifications as a part of a contract though no plans and specifications are attached."

By Corbin on Contracts, § 100, p 315:

"It is not always the price in money that is left uncertain in an agreement; sometimes it is that for which the price is to be paid. If no method is agreed upon for rendering this subject matter sufficiently definite for enforcement, the agreement must nearly always fail of legal effect; it is not customary for courts to fill the gap by finding that a 'reasonable' amount of goods or land or labor has been agreed upon as the exchange for the money. * * *"

■ Neither party to a contract may assume that a contract exists if he knows that the other party does not intend what his words or actions may seem to express.

"If either party knows that the other does not intend what his words or other acts express, this knowledge prevents such words or other acts from being operative as an offer or an acceptance." Restatement, 1 Contracts 75, § 71(c) (1932).

With these general rules of law in mind, we will now consider the contentions of the parties in the light of the evidence most favorable to the plaintiff.

■ The trial court, in granting judgment for the defendant, notwithstanding the verdict of the jury, based its opinion upon the indefiniteness of the subject matter of the offer. The plaintiff contends that the subject matter of the offer is sufficiently definite in

that the parties agreed upon a maximum amount to be paid by the plaintiff for the remodeling of a certain building; that the extent and requirements for remodeling were certain, although no specifications were agreed upon; that the minimum requirements of the building code of the city of Portland required certain materials to be used, and this supplied the lack of specifications as to the work to be done and the material to be used by the defendant. Defendant contends that no agreement existed other than to perform labor at an hourly rate and there was no agreement as to the extent of remodeling or the materials to be used, and therefore no contract existed between the parties.

The difficulty with plaintiff's contentions that the minimal requirements of the city building code are sufficiently definite as a substitute for specifications is that there is no evidence that the parties agreed that compliance with the minimal requirements of the building code would constitute a satisfactory execution of the purported contract, and also there is no evidence that the building code specifies the extent of the remodeling, or the kinds or types of materials that could be satisfactorily used in the remodeling of this particular. Also there is no evidence of what the parties agreed was necessary to constitute a remodeling of the structure.

The building code of the city of Portland was not introduced into evidence, and therefore the jury could not determine whether the building code covered these requirements. There is in fact no evidence as to the manner or extent to which the building was to be remodeled other than that it should be partitioned to accommodate a certain number of rooms; whether the remodeling required the replacement of floors and

stairways; the rooms to be finished of lath and plaster or "dry wall" painted or papered; whether the wiring was to be replaced, or used or new plumbing fixtures installed.

The indefiniteness in these respects is much like a purported contract to rehabilitate land for the sum of $4000 or $5000 where there was no certainty of agreement as to just what must necessarily be done to rehabilitate the land (*Mosteller v. Mashburn*, 64 GA 92, 12 SE2d 142) or like an agreement to tailor a suit or overcoat for $50 where the materials and pattern were not selected or agreed upon (*Factor v. Peabody Tailoring System*, 177 Wis 238, 187 NW 984). In both of these cases the court found that there was not sufficient definiteness to constitute a contract.

The plaintiff cites and relies upon a number of cases, such as *Helm v. Speith*, 298 Ky 225, 182 SW2d 635. In this case the parties agreed that the building should be contracted to comply with the minimal requirements of the Federal Housing Administration, and the Federal Housing Administration requirements were introduced into evidence. It appears from the case that, having agreed to the FHA requirements, which contain detailed specifications, the agreement, by referring to the FHA requirements, made the subject matter sufficiently definite for enforcement, but, as previously stated, there is no evidence that the parties agreed that the minimal requirements of the Portland building code were agreed upon as a basis of their negotiations, nor was it introduced into evidence.

The trial court correctly held that there was no contract.

There is additional reason why the judgment of the trial court should be affirmed. An examination of the evidence of the plaintiff, in our opinion, is such that reasonable minds could reach only the conclusion that at all times the plaintiff knew that the statements made by the defendant with relation to the cost of remodeling of the structure were only estimates and that the plaintiff knew this to be such, therefore the words and actions of the defendant could only be construed as not an offer to remodel the building to the satisfaction of the plaintiff at a fixed maximum amount, nor as an acceptance of such an offer.

The judgment of the trial court is affirmed.