Argued October 31, affirmed November 29, 1978

# SOUTHWORTH, *Respondent,*
## *v.*
# OLIVER et ux, *Appellants.*

(TC L-6544, SC 25607)

587 P2d 994

Duane Vergeer, Portland, argued the cause for appellants. On the briefs was Thomas M. Mosgrove, John Day.

Roy Kilpatrick, Mt. Vernon, argued the cause and filed a brief for respondent. James O. Goodwin, Oregon City, also argued the cause for respondent.

Before Denecke, Chief Justice, and Holman, Tongue, Bryson and Lent, Justices.

TONGUE, J.

**TONGUE, J.**

This is a suit in equity for a declaratory judgment that defendants "are obligated to sell" to plaintiff 2,933 acres of ranch lands in Grant County. Defendants appeal from a decree of specific performance in favor of plaintiff. We affirm.

Defendants contend on this appeal that a certain "writing" mailed by them to plaintiff was not an offer to sell such lands; that if it was an offer there was no proper acceptance of that offer and that any such offer and acceptance did not constitute a binding contract, at least so as to be specifically enforceable. Defendants also filed a demurrer in this court upon the ground that it appears from the face of plaintiff's complaint that the alleged agreement to sell such lands was void as in violation of the statute of frauds.

## *The parties and the property.*

Defendants are ranchers in Grant County and owned ranches in both the Bear Valley area and also in the John Day valley. In 1976 defendants came to the conclusion that they should "cut the operation down" and sell some of the Bear Valley property, as well as some of their Forest Service grazing permits. Defendant Joseph Oliver discussed this matter with his wife, defendant Arlene Oliver, and also with his son, and the three of them "jointly arrived" at a decision to sell a portion of the Bear Valley property. Joseph Oliver also conferred with his accountant and attorney and, as a result, it was decided that the sale "had to be on terms" rather than cash, for income tax reasons. Defendant Joseph Oliver then had "a discussion with Mr. Southworth [the plaintiff] about the possibility of * * * selling this Bear Valley property." Plaintiff Southworth was also a cattle rancher in Bear Valley. The land which defendants had decided to sell was adjacent to land owned by him and was property that he had always wanted.

[ 363 ]

*The initial meeting between the parties on May 20, 1976.*

According to plaintiff, defendant Joseph Oliver stopped by his ranch on May 20, 1976, and said that he [Oliver] was interested in "selling the ranch" and asked "would I be interested in buying it, and I said 'yes'." Mr. Southworth also testified that "he thought I would be interested in the land and that Clyde [Holliday, also a neighbor] would be interested in the permits" and that "I told him that I was very interested in the land * * *."

Plaintiff Southworth also testified that at that time defendant Oliver showed him a map, showing land that he "understood them to offer for sale"; that there was no discussion at that time of price or terms of sale, or whether the sale of the land was contingent on sale of any of the permits, but that the conversation terminated with the understanding:

> "That he would develop and determine value and price and I would make an investigation to determine whether or not I could find the money and get everything arranged for a purchase. In other words, he was going to do A and then I would B."

According to plaintiff Southworth, defendant Oliver said that when he determined the value of the property he would send that information to Southworth so as to give him "notice" of "what he wanted for the land," but did not say that he was also going to give that same information to Mr. Holliday, although he did say that "he planned to talk to Clyde [Holliday] about permits," with the result that plaintiff knew that Oliver "might very well be * * * talking to Clyde about the same thing he talked to you [plaintiff] about" and "give that information to Clyde Holliday as well as yourself."

According to defendant Joseph Oliver, the substance of that initial conversation with plaintiff was as follows:

[ 364 ]

"* * * I told him we were going to condense our ranch down and sell some property and that we were in the process of trying to get some figures from the Assessor on it to determine what we wanted to sell and what we might want to do. Whenever we got this information together we were going to send it to him and some of my neighbors and give them first chance at it. * * *"

Mr. Oliver also testified that plaintiff said that "he was interested"; that he had a map with him; that he mentioned to plaintiff that he "was going to sell some permits," but that there was no discussion "about the permits going with the land at that time" and that he [Oliver] "talked along the lines that Clyde [Holliday] would probably be interested in those permits." On cross-examination Mr. Oliver also answered in the affirmative a question to the effect that the property which he and Mr. Southworth "delineated on the map" during that converation "was the property" that he "finally decided to sell and made the general offering to the four neighbors."

Plaintiff also testified that on May 26, 1976, he called Clyde Holliday to ask if he was interested in buying the land and Mr. Holliday said "no," that he was interested only in the permits, but would be interested in trading some other land for some of the land plaintiff was buying from defendants.

*The telephone call of June 13, 1976.*

Plaintiff testified that on June 13, 1976, he called defendant Oliver by telephone to "ask him if his plans for selling * * * continued to be in force, and he said 'yes'," that "he was progressing and there had been some delay in acquiring information from the Assessor, but they expected soon to have the information needed to establish the value on the land." Defendant Oliver's testimony was to the same effect, but he also recalled that at that time Mr. Southworth "said everything was in order and that I didn't have to worry, he had the money available and that everything was ready to go."

[ 365 ]

*The letters of June 17, June 21, and June 24, 1976.*

Several days later plaintiff received from defendants a letter dated June 17, 1976, as follows:

"Enclosed please find the information about the ranch sales that I had discussed with you previously.

"These prices are the market value according to the records of the Grant County Assessor.

"Please contact me if there are any questions."

There were two enclosures with that letter. The first was as follows:

"JOSEPH C. and ARLENE G. OLIVER
200 Ford Road
John Day, OR 97845

"Selling approximately 2933 Acres in Grant County in T. 16 S., R. 31 E., W. M.

near Seneca, Oregon at the assessed market value of:

|  |  |
|---|---|
| LAND | $306,409 |
| IMPROVEMENTS | 18,010 |
| Total | $324,419 |

"Terms available—29% down—balance over 5 years at 8% interest. Negotiate sale date for December 1, 1976 or January 1, 1977.

"Available after hay is harvested and arrangements made for removal of hay, equipment and supplies.

"ALSO: Selling

"Little Bear Creek allotment permit—1000 head @ $225

"Big Bear Creek allotment permit—200 head @ $250"

The second enclosure related to "selling approximately 6365 acres" in Grant County near John Day— another ranch owned by the Oliver family.

Defendant Joseph Oliver testified that this letter and enclosures were "drafted" by his wife, defendant Arlene Oliver; that he then read and signed it; that he sent it not only to plaintiff, but also to Clyde Holliday and two other neighbors; that it was sent because "I told them I would send them all this information and we would go from there," that it was not made as an offer, and that it was his intention that the "property" and "permits" be transferred "together."

Upon receiving that letter and enclosures, plaintiff immediately responded by letter addressed to both defendants, dated June 21, 1976, as follows:

"Re the land in Bear Valley near Seneca, Oregon, that you have offered to sell; I accept your offer."

Plaintiff testified that on June 23, 1976, Clyde Holliday called and said he needed to acquire a portion of the land "that I had agreed to buy from Joe [Oliver], and I said I have bought the land," and that we would "work out an exchange in accord with what we have previously mentioned," but that "[h]e said he needed more land."

Defendant Joseph Oliver testified that after receiving plaintiff's letter dated June 21, 1976, Clyde Holliday told him that "they [Holliday and plaintiff] were having a little difficulty getting this thing worked out," apparently referring to the "exchange" previously discussed between plaintiff and Holliday, and that he (Oliver) then told plaintiff that:

"* * * [T]here seemed to be some discrepancies between what I was getting the two parties and that I didn't exactly want to be an arbitrator or say you are right or you are wrong with my neighbors. I wished they would straighten the thing out, and if they didn't, I really didn't have to sell it, that I would pull it off the market, because I didn't want to get in trouble. I would have to live with my neighbors."

Finally, on June 24, 1976, defendants mailed the following letter to plaintiff:

"We received your letter of June 21, 1976. You have misconstrued our prior negotiations and written summaries of the lands which we and J. C. wish to sell. That was not made as or intended to be a firm offer of sale, and especially was not an offer of sale of any portion of the lands and permits described to any one person separately from the rest of the lands and permits described.

"The memorandum of ours was for informational purposes only and as a starting point for further negotiation between us and you and the others also interested in the properties.

[ 367 ]

"It is also impossible to tell from the attachment to our letter of June 17, 1976, as to the legal description of the lands to be sold, and would not in any event constitute an enforceable contract.

"We are open to further negotiation with you and other interested parties, but do not consider that we at this point have any binding enforceable contract with you."

This lawsuit then followed.

### *Defendants' letter of June 19, 1976, was an "offer to sell" the ranch lands.*

Defendants first contend that defendants' letter of June 17, 1976, to plaintiff was "not an offer, both as a matter of law and under the facts of this case." In support of that contention defendants say that their testimony that the letter was not intended as an offer was uncontradicted and that similar writings have been held not to constitute offers.[1] Defendants also say that there is "authority for the proposition that all the evidence of surrounding circumstances may be taken into consideration in making that determination"[2] and that the circumstances in this case were such as to require the conclusion that defendants did not intend the letter as an offer and that plaintiff knew or reasonably should have known that it was not in-

"1. Defendants obviously did not intend it as an offer.

"2. The wording of the 'offer' made it clear that this was 'information' that plaintiff had previously expressed an interest in receiving.

"3. It did not use the term offer, but only formally advised plaintiff that defendants are selling certain

---

[1] Citing *Courteen Seed Co. v. Abraham,* 129 Or 427, 275 P 684 (1929); *Klimek v. Perisich,* 231 Or 71, 371 P2d 956 (1962); *Nebraska Seed Co. v. Harsh,* 98 Neb 89, 152 NW 310 (1915); *Mellen v. Johnson,* 322 Mass 236, 76 NE2d 658 (1948); *Owen v. Tunison,* 131 Me 42, 158 A 926 (1932); and *Richards v. Flower,* 193 Cal App 2d 233, 14 Cal Rptr 228 (1961).

[2] Citing *Metropolitan Life Ins. Co. v. Kimball,* 163 Or 31, 94 P2d 1101 (1939); *Nebraska Seed Co. v. Harsh, supra* n.1; *Klimek v. Perisich, supra* n.1; *Mellen v. Johnson, supra* n.1; and 1 Restatement of Contracts § 25 (1932).

[ 368 ]

lands and permits and set forth generally the terms upon which they would consider selling.

"4. The plaintiff knew of the custom of transferring permits with land and had no knowledge from the writing or previous talk that defendants were selling any cattle.

"5. Plaintiff knew and expected this same information to go to others."

Defendants conclude that

"Considering the factors determined important by the authorities cited, these factors preponderate heavily that this was not an offer to sell the land only, or to sell at all, and should not reasonably have been so construed by the plaintiff."

In *Kitzke v. Turnidge,* 209 Or 563, 573, 307 P2d 522 (1957), this court quoted with approval the following rule as stated in 1 Williston on Contracts 49-50, § 22A (1957):

" '* * * In the early law of assumpsit stress was laid on the necessity of a promise in terms, but the modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances. Even where words are used, 'a contract includes not only what the parties said, but also what is necessarily to be implied from what they said.' And it may be said broadly that any conduct of one party, from which the other may reasonably draw the inference of a promise, is effective in law as such.' "

To the same effect, *see Kabil Developments Corp. v. Mignot,* 279 Or 151, 158, 566 P2d 505 (1977); *Klimek v. Perisich,* 231 Or 71, 78, 371 P2d 956 (1962); Restatement of Contracts 2d § 24 (1973); and Murray on Contracts 36, § 22 (1974). *See also Harty v. Bye,* 258 Or 398, 404, 483 P2d 458 (1971).

As also stated in 1 Restatement of Contracts § 25, Comment (*a*) (1932), as quoted by this court with approval in *Metropolitan Life Ins. Co. v. Kimball,* 163 Or 31, 58, 94 P2d 1101 (1939):

"It is often difficult to draw an exact line between offers and negotiations preliminary thereto. It is common for one who wishes to make a bargain to try to induce the other party to the intended transaction to make the definite offer, he himself suggesting with more or less definiteness the nature of the contract he is willing to enter into. Besides any direct language indicating an intent to defer the formation of a contract, the definiteness or indefiniteness of the words used in opening the negotiation must be considered, as well as the usages of business, and indeed all accompanying circumstances."

■■ The difficulty in determining whether an offer has been made is particularly acute in cases involving price quotations, as in this case. It is recognized that although a price quotation, standing alone, is not an offer,[3] there may be circumstances under which a price quotation, when considered together with facts and circumstances, may constitute an offer which, if accepted, will result in a binding contract.[4] It is also recognized that such an offer may be made to more than one person.[5] Thus, the fact that a price quotation is sent to more than one person does not, of itself, require a holding that such a price quotation is not an offer.

We agree with the analysis of this problem as stated in Murray on Contracts 37-40, § 24 (1977), as follows:

"If *A* says to *B,* 'I am going to sell my car for $500,' and *B* replies, 'All right, here is $500, I will take it,' no contract results, assuming that *A's* statement is taken at its face value. *A's* statement does not involve any promise, commitment or undertaking; it is at most a statement of *A's present intention.* \* \* \*

"\* \* \* \* \*

---

[3] *See* 1 Corbin on Contracts 77-78, § 26 (1963).

[4] *See* 1 Williston on Contracts 65, § 221 (1957); Murray on Contracts 37-40, § 24 (1974), and Calimari and Perillo, Contracts 39, § 2-10 (1977).

[5] 1 Restatement of Contracts 36, § 28 (1932).

"* * * However, a price quotation or advertisement may contain sufficient indication of willingness to enter a bargain so that the party to whom it is addressed would be justified in believing that his assent would conclude the bargain. * * *

"* * * * *

"* * * The basic problem is found in the expressions of the parties. People very seldom express themselves either accurately or in complete detail. Thus, difficulty is encountered in determining the correct interpretation of the expression in question. Over the years, some more or less trustworthy guides to interpretation have been developed.

"The first and strongest guide is that the particular expression is to be judged on the basis of what a reasonable man in the position of the offeree has been led to believe. This requires an analysis of what the offeree should have understood under all of the surrounding circumstances, with all of his opportunities for comprehending the intention of the offeror, rather than what the offeror, in fact, intended. This guide may be regarded as simply another manifestation of the objective test. Beyond this universally accepted guide to interpretation, there are other guides which are found in the case law involving factors that tend to recur. The most important of the remaining guides is the language used. If there are no words of promise, undertaking or commitment, the tendency is to construe the expression to be an invitation for an offer or mere preliminary negotiations in the absence of strong, countervailing circumstances. Another guide which has been widely accepted is the determination of the party or parties to whom the purported offer has been addressed. If the expression definitely names a party or parties, it is more likely to be construed as an offer. If the addressee is an indefinite group, it is less likely to be an offer. The fact that this is simply a guide rather than a definite rule is illustrated by the exceptional cases which must be noted. The guide operates effectively in relation to such expressions as advertisements or circular letters. The addressee is indefinite and, therefore, the expression is probably not an offer. However, in reward cases, the addressee is equally indefinite and, yet, the expression is an offer. Finally, the definiteness of the proposal itself

may have a bearing on whether it constitutes an offer. In general, the more definite the proposal, the more reasonable it is to treat the proposal as involving a commitment. * * *" (Footnotes omitted)

Upon application of these tests to the facts of this case we are of the opinion that defendants' letter to plaintiff dated June 17, 1976, was an offer to sell the ranch lands. We believe that the "surrounding circumstances" under which this letter was prepared by defendants and sent by them to plaintiff were such as to have led a reasonable person to believe that defendants were making an offer to sell to plaintiff the lands described in the letter's enclosure and upon the terms as there stated.

That letter did not come to plaintiff "out of the blue," as in some of the cases involving advertisements or price quotations. Neither was this a price quotation resulting from an inquiry by plaintiff. According to what we believe to be the most credible testimony, defendants decided to sell the lands in question and defendant Joseph Oliver then sought out the plaintiff who owned adjacent lands. Defendant Oliver told plaintiff that defendants were interested in selling that land, inquired whether plaintiff was interested, and was told by plaintiff that he was "very interested in the land," after which they discussed the particular lands to be sold. That conversation was terminated with the understanding that Mr. Oliver would "determine" the value and price of that land, i.e., "what he wanted for the land," and that plaintiff would undertake to arrange financing for the purchase of that land. In addition to that initial conversation, there was a further telephone conversation in which plaintiff called Mr. Oliver "to ask him if his plans for selling * * * continued to be in force" and was told "yes"; that there had been some delay in getting information from the assessor, as needed to establish the value of the land; and that plaintiff then told Mr. Oliver that "everything was in order" and that "he had the money available and everything was ready to go."

Under these facts and circumstances, we agree with the finding and conclusion by the trial court, in its written opinion, that when plaintiff received the letter of June 17th, with enclosures, which stated a price of $324,419 for the 2,933 acres in T 16 S, R 31 E., W.M., as previously identified by the parties with reference to a map, and stating "terms" of 29 percent down—balance over five years at eight percent interest—with a "sale date" of either December 1, 1976, or January 1, 1977, a reasonable person in the position of the plaintiff would have believed that defendants were making an offer to sell those lands to him.

This conclusion is further strengthened by "the definiteness of the proposal," not only with respect to price, but terms, and by the fact that "the addressee was not an indefinite group." *See* Murray, *supra,* at 40.

As previously noted, defendants contend that they "obviously did not intend [the letter] as an offer." While it may be proper to consider evidence of defendants' subjective intent under the "objective test" to which this court is commited, it is the manifestation of a previous intention that is controlling, rather than a "person's actual intent."[6] We do not agree with defendants' contention that it was "obvious" to a reasonable person, under the facts and circumstances of this case that the letter of January 17th was not intended to be an offer to sell the ranch lands to plaintiff.

We recognize, as contended by defendants, that the failure to use the word "offer," the fact that the letter included the "information" previously discussed between the parties, and the fact that plaintiff knew that the same information was to be sent to others, were important facts to be considered in deciding whether plaintiff, as a reasonable person, would have been led to believe that this letter was an "offer." *See also* Murray, *supra,* at 40. We disagree, however, with defendants' contention that these and other factors

---

[6] *See Kabil Developments Corp. v. Mignot,* 279 Or 151, 158, 566 P2d 505 (1977).

[ 373 ]

relied upon by defendants "preponderate" so as to require a holding that the letter of January 17th was not an offer.

The failure to add the word "offer" and the use of the word "information" are also not controlling, and, as previously noted, an offer may be made to more than one person. The question is whether, under all of the facts and circumstances existing at the time that this letter was received, a reasonable person in the position of the plaintiff would have understood the letter to be an offer by defendants to sell the land to him.

Defendants also contend that "plaintiff knew of the custom of transferring [Forest Service grazing] permits with the land and had no knowledge from the writing or previous talk that defendants were selling any cattle" (so as to provide such a basis for a transfer of the permits).[7] Plaintiff testified, however, that at the time of the initial conversation, Mr. Oliver told plaintiff that he thought plaintiff "would be interested in the land and that Clyde would be interested in the permits." In addition, defendant Joseph Oliver, in response to questions by the trial judge, although denying that at that time he told plaintiff that he was "going to offer the permits to Mr. Holliday," admitted that he "knew Mr. Holliday was interested in the permits" and "could have" told plaintiff that he was "going to talk to Mr. Holliday about him purchasing the permits."

On this record we believe that plaintiff's knowledge of the facts noted by defendants relating to the transfer of such permits did not require a holding that,

[7]Defendants offered testimony that Forest Service grazing permits could only be transferred with a sale of "commensurate land" sufficient to support the cattle subject to such permits or with a sale of such cattle to another party and that defendants did not desire to sell such cattle and had a policy against doing so. Defendants contend that, as a result, the value of these permits would be lost to them unless the permits were sold with the land and at a price to be added to the price for the land. Defendants also contend that plaintiff was aware of these facts.

as a reasonable man, he did not understand or should not have understood that defendants' letter of June 17th was an offer to sell the ranch lands to him.

*Plaintiff's letter of June 21, 1976, was an acceptance of defendants' offer to sell the ranch lands.*

The trial court, in a written opinion stating its findings of fact and conclusions of law, held that:

"\* \* \* [T]his court finds that the conduct of the defendant together with the words (in Exhibit 3): 'Selling \* \* \* at the assessed market value \* \* \* terms available \* \* \*' leads to only one reasonable objective conclusion; the defendants were making an offer to sell their property."

As previously stated, we agree with that finding and conclusion. In that same opinion, the trial court then considered the question whether plaintiff's letter of June 21, 1976, was an acceptance of that offer.

As previously stated, plaintiff responded to defendants' letter of June 17, 1976, by a letter dated June 21, 1976, as follows:

"Re the land in Bear Valley near Seneca, Oregon, that you have offered for sale; I accept your offer."

The trial court held that the letter was an acceptance of defendants' offer as an offer to sell their ranch lands, but was not an acceptance of any offer to sell the grazing permits. In so holding the trial court recognized that the terms of an acceptance cannot vary from the terms of an offer, but went on to state as follows:

"It is undisputed that both parties were aware that grazing permits can only be 'waived' (transferred) if there is commensurate land or cattle. Without either, the permits expire. At the first conversations between the parties, defendant advised plaintiff that he was going to offer the permits to plaintiff's neighbor.

"\* \* \* \* \*

"There were no preliminary discussions between the parties about whether the permits would be sold separately. From the defendants' conversation, the plaintiff could reasonably believe that the permits were going to

[ 375 ]

be sold to someone else, since a neighbor with available commensurate land could arrange for their transfer or defendants could potentially retain the permits for their own use if land or cattle remained as a base. The lack of specificity as to terms negates this portion of Exhibit 3 as an offer and constitutes only a preliminary negotiation. * * * Its separation from the sale price and specific terms of the Bear Valley land in Exhibit 3 lend further objective manifestation that the purchase of the permits could be severed. * * *"

Defendants contend that the trial court reached "inconsistent conclusions" in first holding that defendants' letter of June 17th was an offer to sell the ranch lands, but that the same letter was not sufficiently specific to constitute an offer to sell the grazing permits. Defendants' brief then discusses at some length their contention that defendants' letter of June 17th was ambiguous, and contends that it was "against reason" to construe that letter as "anything but an offer to sell the lands and permits as a package."

We view the opinion of the trial court, however, as holding that plaintiff's letter of June 21st was an acceptance only of an offer by defendants to sell the ranch lands, but not an acceptance of any offer to sell the grazing permits, as being based upon two independent grounds: (1) that from the previous conversations between the parties plaintiff could reasonably believe that the permits were going to be sold to someone else; i.e., that defendants' letter of June 17th was an offer to sell to plaintiff the ranch lands separately from the permits, and that, in any event, (2) that there was such a "lack of specificity" in the terms of defendants' letter of June 17th as they related to the permits as to "negate" that portion of the letter as an offer to sell the permits.

In our opinion, any inconsistency in the opinion of the trial court in its holding that defendants' letter of June 17th was sufficiently specific to constitute an offer to sell the ranch lands, but was not sufficiently

specific to constitute an offer to sell the grazing permits, is not fatal to the ultimate holding by the trial court that defendants' letter of June 17th was an offer to sell the ranch lands to plaintiff, and that his responding letter of June 21st was an acceptance of that letter as an offer to sell such lands separately from any sale of the grazing permits. Again, this is because, we agree with the trial court in the finding and conclusion as stated in its written opinion that under all of the facts and circumstances, including the preliminary discussions between the parties, "the plaintiff could reasonably believe that the permits were going to be sold to someone else." Having reached this conclusion it is immaterial, in our view, whether or not defendants' letter of June 17th was ambiguous, except as any such ambiguity was properly a factor in reaching a conclusion whether, under all the facts and circumstances, a reasonable person in plaintiff's position would have understood defendants' letter of June 17th to be an offer to sell the ranch lands to him separately from the grazing permits.

■ The further fact, as noted by defendants, that plaintiff did not rely on anything in the letter of June 17th as a "document" to "tell whether the permits had to go with the land or not" is also inconclusive, in our opinion. This is because, as previously stated, not only the words of that letter, but all of the facts and circumstances, including the initial conversation between the parties and their later telephone conversation, were to be considered in making a finding or conclusion that a reasonable person in plaintiff's situation would have understood the letter of June 17th to be an offer by defendants to sell the ranch lands separately from the range permits.

*The resulting agreement was sufficiently definite for enforcement by specific performance.*

Defendants contend that any contract resulting from defendants' offer and plaintiff's acceptance was

[ 377 ]

not "a binding contract capable of specific enforcement" because "all of the elements essential to a contract were not agreed upon by the parties" in that "the security device was not agreed upon"; that "without this essential element no binding time sale contract came into existence"; and that "that element [could not] be supplied by the court."

It is true, as contended by defendants, that this sale was to be on deferred payments, with the result that plaintiff did not have the right to pay cash (as in *Phillips v. Johnson,* 266 Or 544, 514 P2d 1337 (1973)), and that the parties did not agree upon a "security device."

Defendants say that in *Phillips* this court held that an earnest money contract for the sale of land was not enforceable unless the type of security device to be in the final contract was agreed upon in that preliminary writing and that this requirement was also implicitly recognized by this court in *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974).

In *Phillips v. Johnson, supra,* it appears (at 556) that the parties had not only not agreed in their earnest money agreement upon the terms of "security provisions," but that there had been no agreement "whether the sale was to be consummated by a deed (or by deed, note and mortgage) or by a land sale contract" and the purchaser had the option to pay in cash. Also (as noted at 557), there was no agreement "under which plaintiffs would be entitled to require defendants to accept installment payments over a period of time." Thus, the absence of agreed "security provisions" was not the primary problem in that case.

Under those facts, we reversed the decree of a trial court granting specific performance of the earnest money agreement by requiring performance of a land sale contract (including provisions for future installment payments) but required specific performance by the entry of a decree conditioned upon payment of the purchase price in full and in cash, as the purchaser

had the right to do under the terms of the earnest money agreement. On the other hand, in this case plaintiff, as the purchaser, did not have the right to make full payment in cash, under the terms of the offer accepted by him, but the defendants, as the sellers, were required to accept 29 percent as a down payment and the balance by installment payments over a period of five years, with interest at eight percent.

In *Howard v. Thomas,* 270 Or 6, 526 P2d 552 (1974), the earnest money agreement provided for a down payment and for installment payments at an agreed rate of interest. Defendants contended there were various necessary items which were not included in the earnest money agreement, including failure to delineate the type of security agreement to be used in the sale. Under those facts the court affirmed a decree for specific performance requiring execution not only of a standard warranty deed, but also of a security agreement in the form of a standard printed form note and mortgage. In reaching that decision this court (at 9-10) distinguished its previous decision in *Phillips v. Johnson, supra,* and went on to hold (at 12-13):

> "A reading of the record indicates that the defendants decided to attempt to withdraw from the sale, not because of the uncertainty of the terms of the sale, but for other reasons.

> "We belive that the earnest money receipt was sufficiently definite and certain to justify specific performance. The problems of any consequence which seemed to bother defendants at the time of trial were, in our opinion, resolved in favor of defendants by the decree of the court. The law is well established that the court, under proper circumstances, may in its decree providing for specific performance fill in any 'gaps' appearing in the contract. As Professor Williston states:

>> " 'If there is sufficient intent expressed to make a legally valid contract, a court of equity can make certain by its decree, within reasonable limits, subordinate details of performance which the contract

[ 379 ]

itself does not state. \* \* \*' 11 Williston on Contracts (3d ed) 814, § 1424."

Similarly, in this case, it appears that defendants' decision to withdraw from the sale was not because of uncertainty with the terms of the "security provisions," as now urged by them on this appeal. We also believe that the terms as stated in defendants' written offer, as accepted by plaintiff, resulted in a contract which was sufficiently definite and certain to justify specific performance. Under the facts and circumstances of this case, the absence of agreement upon terms of "security provisions" was a "gap" in "subordinate details of performance" of such a nature as to be properly "made certain" by a decree of specific performance in a court of equity. As in *Howard v. Thomas, supra,* the decree of the trial court required the parties to sign a standard printed form document. In this case the document to be signed by both parties under the decree of the trial court is in the form of a printed land sale contract on installment payments, with standard form security provisions,[8] as compared with a printed mortgage, with standard security provisions, in *Howard v. Thomas, supra.*

## The statute of frauds.

Defendants filed in this court, for the first time, a "general demurrer for want of equity" upon the ground that the complaint "fails to state facts sufficient to constitute a cause of suit for declaratory judgment or specific performance against defendants." In support of that demurrer defendants contend that it

[8]That printed contract includes customary security provisions which provide, among other things, that the purchaser shall keep all buildings in good condition and repair and insured for not less than their cash value in a company satisfactory to the seller; that the purchaser shall not permit waste; that he will keep the premises free from liens and pay all taxes and other public charges; that in the event of a failure to make any payments required by the contract punctually or to keep any of the agreements as provided by it the seller has the option (1) to declare the contract void; (2) to declare the entire contract balance due and payable, with interest, or (3) to foreclose the contract by suit in equity, and, in any of such cases, to take possession of the property and to retain all previous payments. Also included are the usual "time essence" and "nonwaiver" provisions.

[ 380 ]

appears upon the face of the complaint that plaintiff seeks to specifically enforce a contract for the sale of real property which fails to meet the requirements of the Statute of Frauds (ORS 41.580) in that defendant Joseph Oliver failed to subscribe the purported agreement and his wife, defendant Arlene Oliver, "failed to subscribe or even sign the purported agreement, and nothing in the complaint alleges that her husband had written authority to act as her agent." Defendants cite our previous decision in *Webster et ux v. Harris,* 189 Or 671, 222 P2d 644 (1950), as a case in which "[t]he court sustained defendant's demurrer, even though this issue was not raised until the case was on appeal." Defendants contend that "this issue should not be considered waived * * * since it challenges the sufficiency of the complaint."

It is true that in *Webster v. Harris, supra,* this court stated the familiar rule that the objection that a complaint does not state a cause of action is never waived and may be raised for the first time in this court. In that case, however, a demurrer to the complaint had been filed in the trial court and the overruling of that demurrer was defendant's "chief assignment of error" on his appeal to this court. It follows that *Webster* did not directly hold that a defendant who did not demur to a complaint in the lower court may contend for the first time on appeal that it appears from the face of the complaint that an alleged agreement does not satisfy the Statute of Frauds.

In this case, no demurrer was filed by defendants in the trial court and no error is assigned in the overruling of such a demurrer. In addition, the strict view taken of the Statute of Frauds by this court in *Webster* has been criticized, if not modified by subsequent decisions of this court.[9] This court has also recognized

---

[9] Thus, in *Stevens v. Good Samaritan Hosp,* 264 Or 200, 203, 504 P2d 749 (1972), this court said that despite the strict view of the Statute of Frauds as stated in *Webster* "neither this court nor others * * * have

that the defense of the Statute of Frauds may be waived. *See, e.g., Belton v. Buesing,* 240 Or 399, 410 n.12, 402 P2d 98 (1965). The court has also said that a court of equity may not permit such a defense if to do so would be inequitable or unconscionable, as in the event of "fraud inhering in the consequence of * * * setting up the statute." *Young v. Neill et al,* 190 Or 161, 179, 220 P2d 89, 225 P2d 66 (1950).

Consistent with this view of the Statute of Frauds it is the general rule, as held by many courts in many cases, that "it cannot be objected for the first time on appeal that the instrument or contract in suit * * * is void and unenforceable under the Statute of Frauds.[10]

In accord with that rule, this court, in *Hawley v. Dawson,* 16 Or 344, 347, 18 P 592 (1888), said, in rejecting a contention on appeal that "any promise to pay the plaintiff, * * * was void, for the reasons that it was not in writing," as required by the Statute of Frauds:

"* * * To make this objection available it ought to be presented by an exception to the ruling of the court below, either to the admission or exclusion of evidence, or to the giving or refusing instructions, *or by demurrer in a proper case.* So far as I am able to discover from the record this objection was not made in the court below in any form, and of course for that reason could not be presented here for the first time. * * *" (Emphasis added)

To the same effect, although under different facts, this court said in *Fabre v. Halvorson,* 250 Or 238, 240-41, 441 P2d 640 (1968), that:

applied the statute of frauds in a literal manner." Similarly, this court in *Golden v. Golden,* 273 Or 506, 510, 541 P2d 1397 (1975), said that the Statute of Frauds is to be given "the interpretation which comports with its purpose," with a "but see" footnote referring to *Webster.*

[10]*See* 4 CJS, Appeal & Error 688, § 233, n.26 (1957), citing many cases from many jurisdictions. *See also* 5 Am Jur 2d, Appeal and Error 50, § 526, n.8 (1962), citing many cases, although also citing one case as holding to the contrary where it appears from the face of the complaint that the requirements of the statute have not been met.

"* * * The Statute of Frauds (ORS 41.580) was not asserted by either side in this case. Accordingly, we need not decide whether it applied to any part of the case. The factual issues were submitted to the trial court. That court's findings of fact are conclusive."

*See also Masters et al v. Bidler et al,* 101 Or 322, 335, 198 P 912, 199 P 920 (1921).

■ Because the Statute of Frauds is a defense which may be waived and also because, if raised in the trial court, plaintiff may be able in some cases to allege and prove facts sufficient to overcome the Statute of Frauds, and because of the general rule that, in the interests of efficient administration of justice, errors not raised in the trial court may not be raised for the first time on appeal, we hold, consistent with our previous holding in *Fabre* and in *Hawley,* that when no demurrer has been filed to the complaint in the trial court and no contention has been raised in the trial court in reliance on the Statute of Frauds, no such contention may be raised for the first time in this court, either by general demurrer or otherwise.

In this particular case the letter of June 17, 1976, which is the focus of defendants' contention, although not signed by Mrs. Oliver, was admittedly "drafted" by her after discussions with Mr. Oliver. It was signed by him as "Joe." The subsequent letter of June 24, signed by both Mr. and Mrs. Oliver, although contending that the previous letter was not an "offer," made no contention that it was not authorized by both of them, whatever its legal effect might be. In reliance upon that offer plaintiff incurred the expense of this lawsuit. These circumstances may or may not be sufficient to constitute ratification or a waiver or estoppel to enforce the Statute of Frauds so as to cause a court of equity to refuse to enforce that statute. We need not, however, base our decision in this case on such facts, in view of defendants' failure to raise the Statute of Frauds in the trial court, either by demurrer or otherwise.

[ 383 ]

For all of these reasons, the decree of the trial court is affirmed.