Argued and submitted April 23, affirmed August 4, 1980

SCHEILE, et ux,
*Respondents,*
*v.*
FORDYCE, et ux,
*Appellants.*

(No. 78-2885-E-1, CA 15378)

614 P2d 1217

William E. Duhaime, Medford, argued the cause for appellants. With him on the briefs were Timothy C. Gerking and Brophy, Wilson & Duhaime, Medford.

Robert H. Grant, Medford, argued the cause for respondents. With him on the brief was Grant, Ferguson & Carter, Medford.

Before Richardson, Presiding Judge, and Thornton and Buttler, Judges.

THORNTON, J.

Buttler, J., specially concurring opinion.

## THORNTON, J.

Defendants (vendors)[1] appeal from a decree in favor of plaintiffs (purchasers) specifically enforcing an option contract for the purchase of a house, assigning as error the following:

1) The trial court's holding that the original option agreement was orally extended beyond its stated September 1, 1977, expiration date;

2) The holding that the option, if it was extended, was not terminated by written notice delivered to plaintiffs on July 3, 1978;

3) The decree specifically enforcing the option contract where there was no "meeting of the minds" with respect to several material terms:

4) The holding that a "list-back" agreement which defendants insisted on was against public policy as an unreasonable restraint of trade and enforcing the contract without this provision.

We summarize the facts as follows:

Defendant Fordyce (hereafter "defendant") is a building contractor and a real estate broker. On February 7, 1977, the parties signed a standard earnest money agreement modified to provide that plaintiffs would lease defendants' house at $385 per month and would have the option of buying the house for $52,000. Plaintiffs paid $1,500 for the option which was to be forfeited if the option were not exercised by September 1, 1977, when it expired. If the option were

---

[1] Defendants are husband and wife. The property in dispute is in their joint names. Defendant wife played no active role with respect to the transaction; her husband was apparently authorized to act in her behalf. Therefore, where the word "defendant" is used, it refers exclusively to defendant husband. The plural, "defendants," is used where the joint rights of husband and wife are involved.

exercised, $100 per month credit toward the purchase price was to be allowed from the rental payments.

By a writing dated February 19, 1977, which referred back to the February 7 agreement, the parties further agreed: (1) that the option was to be converted to a purchase agreement by payment of $5,000 prior to September 1, 1977; (2) that plaintiffs would make further payments to enable them to assume the existing mortgage loan; and (3) that the final down payment would be made by September 1, 1979. The parties further agreed that, as an alternative to cashing out defendants' equity in the house and assuming the existing loan, plaintiffs could refinance the entire purchase.

According to plaintiffs' testimony, on or before September 1, 1977, Mr. Scheile met with Mr. Fordyce and told him that, because of unforeseen developments in his business, he would not be able to raise the necessary money to exercise the option in time. Defendant allegedly orally consented to an indefinite extension of time. Defendant denies this. He contends that, while he agreed "to go along with" plaintiffs and was willing to sell the house to them on similar terms, he regarded the option agreement as terminated and felt that some of the terms would have to be renegotiated. Defendant claims this viewpoint was explicitly communicated to Mrs. Scheile, which the latter denies.

In February, 1978, plaintiffs felt they were in a position to proceed with the sale. Nothing in the way of formal communications passed beween the parties during the interim, although Mrs. Scheile was in regular contact with defendants' sales representative and at all times professed an intent to eventually proceed with the contract. There was evidence that defendant discussed with plaintiffs the possibility of proceeding by paying defendants $1,500 every three months to the extent of their equity in lieu of paying $5,000. At this time, *i.e.,* February, 1978, plaintiffs requested a break-

down to let them know "where they stood" in terms of consummating the sale. In response, defendant prepared a memorandum stating the purchase price at $52,000, showing a credit for $1,500 option money and $600 from rental payments (apparently from February to September, 1977). The $5,000 payable under the terms of the option amendment is also shown as a credit against the purchase price and is noted as "past due." It indicates a monthly payment computed so as to pay off defendants' equity by September, 1979, and including one-twelfth of the property taxes. Finally, it indicates the balance of the outstanding loan as of February, 1978, and calls for plaintiffs to furnish fire insurance.

In early March, 1978, plaintiffs contacted defendant and asked him to prepare a contract to complete the sale. A contract was drawn and a copy delivered to plaintiffs. They objected to the contract on the basis that it made no provision for defendant to furnish title insurance or for a collection escrow, both of which were required by the signed option agreement. The contract also did not provide for conveyance of Mrs. Fordyce's interest in the residence. When plaintiffs voiced their objections, defendant told them to consult with an attorney. Their regular attorney had a conflict of interest and referred them to another attorney. He agreed to take the case but, since he was going on vacation, he turned the matter over to his partner.

Between late March and the first part of June, no significant developments occurred, although communication with respect to the disputed terms was apparently ongoing. Defendant wrote two letters in May to speed up the process. In mid-June, plaintiffs' attorney, following discussions with plaintiffs and with defendants' attorney, drew up a second draft contract. Prior to this draft, Mrs. Scheile (but not Mr. Scheile) signed the first contract which had already been signed by defendant. Plaintiffs testified that they

ultimately acquiesced to defendant's demands and were prepared to purchase their own title insurance and pay the escrow fee.

The second contract included new terms insisted upon by defendant— an increase in the interest rate on the unpaid balance, a restriction on transferring any interest in the property without prior consent of defendant and a waiver of disclosure of truth-in-lending information. Plaintiffs objected not only to the inclusion of these terms but to the fact that the title insurance and escrow provisions missing from the first draft were absent from this one as well. Further discussions followed between plaintiffs and their attorney. The latter testified that he felt there was ultimate agreement on the additional terms and the contract was sent to defendant along with the $5,000 payment. The $5,000 was deposited in defendants' attorney's trust account, where it remained until transferred to escrow in July.

Defendant, however, rejected the second draft because it did not contain all of the additional terms he requested, in particular, a provision for a 5 percent late payment penalty. A third draft was prepared by plaintiffs' attorney, which included this term. At this point, negotiations broke down. Defendant told plaintiffs that if the third contract was not signed by July 3, 1978, the deal was off completely. Plaintiffs did not sign and defendant delivered a notice to them to quit the property within 30 days. Several days later, plaintiffs approached defendant and asked if there was some way the sale could be consummated. Defendant testified that he was aware that the residence had appreciated substantially in value since the original option agreement was signed and offered to sell the house for $64,000, which he felt equally divided that increase in value between the parties. In the alternative, as a means of partially recouping this appreciation in value, he offered to sell the house at the original price subject to a condition in the deed

(termed a "list-back agreement") that if the property were resold within 15 years by plaintiffs or their successors, the property would be listed with defendant's real estate firm.

Plaintiffs objected ultimately to this proposed term. For some reason that is not clear from the record, however, this contract was sent to the escrow agent for finalizing. Plaintiffs signed escrow instructions based on the terms of the original option agreement. The sale was structured as a cash sale and plaintiffs deposited sufficient cash to cover defendants' equity. Defendant was informed that the papers were ready to sign, went to the title company and signed escrow instructions similar to those of plaintiffs. He discovered that the "list-back" restriction had not been added to the deed and amended the deed to include this provision (stated to run for 10 rather than 15 years). When plaintiffs were informed of this, they amended their instructions to indicate that the restriction was not acceptable to them. Defendant thereafter amended his instructions to require closing of the sale by July 24. Plaintiffs took no further action and this suit followed.

The complaint sought specific performance of the option agreement as set forth in the original agreement, the February, 1977, modification and the February 19, 1978, memorandum. In a separate count, plaintiffs sought enforcement of the first contract prepared by defendant's attorney and signed by defendant and Mrs. Scheile. Defendants denied the pertinent allegations and counterclaimed for rent which remained unpaid at the time of the suit (plaintiffs continued to reside in the house but paid no rent) and for ejectment.

The trial court found that plaintiffs were entitled to specific performance of the original option agreement as embodied in the signed escrow instruction, holding that defendant waived his right to insist on execution of the option agreement by September 1,

1977. The decree also specified that plaintiffs were to pay rent for the period between July, 1978, and the date the sale is consummated. We affirm.

As an initial matter, we resolve the dispute in the testimony as to whether defendant ever unequivocally informed plaintiffs that the option was terminated as of September 1, 1977, and that any subsequent agreement would be on newly negotiated terms in favor of plaintiffs. We base this conclusion in part on the deference we accord trial court determinations which turn mainly on the credibility of witnesses. Additionally, it appears from the other evidence, particularly the February, 1978, memorandum, that defendant at no point prior to the first draft contract in March, 1978, indicated to plaintiffs that he would demand terms other than those contained in the option agreement.

The central dispute in this case involves the legal significance to be attached to the oral extension of time. Plaintiffs contend that defendant by his conduct waived his right to insist on the timely exercise of the option agreement. Defendants argue on the other hand that the oral extension is a modification of the terms of the option and that such a modification, since the option is required to be in writing under the statute of frauds, must also be in writing to be enforceable.

For the reasons which follow, we believe that defendants are precluded by the manner in which the case was pleaded and tried from asserting the statute of frauds in this case. The amended complaint pleaded the agreement of the parties as embodied in the original option contract, the written modification of February, 1977, and the memorandum summarizing the status of plaintiffs' obligations under the option prepared by defendant in February, 1978. Copies of these documents were attached to the complaint. The answer denies the agreement as pleaded and raises

three counterclaims but no affirmative defenses. The option agreement stated on its face that the option expired September 1, 1977, but defendants filed no demurrer and made no motion for judgment on the pleadings or summary judgment.

At trial, evidence of the oral extension came from both parties and no objections were made on the basis that such evidence was outside the scope of the issues framed by the pleadings. Defendants state in their reply brief that the statute of frauds question was adequately raised at trial and was not waived. They cite no transcript reference for this contention and we can find no evidence that such is the case. *Southworth v. Oliver,* 284 Or 361, 381-83, 587 P2d 994 (1978), *Davidson v. Wyatt,* 289 Or 47, 57-58, 609 P2d 1298 (1980).

■ Accordingly, the issue of whether the statute of frauds precludes enforcement of the oral extension has not been properly raised and we need not consider the issue on appeal. The question that remains is whether the evidence establishes that defendants waived their right to declare the option contract terminated as of September 1, 1977, or thereafter, and insist on other terms if the sale were to proceed. In *Laster v. Hiebert,* 284 Or 493, 499-501, 587 P2d 461 (1978), the court held that repeated acceptance of late payments by the sellers precluded them from declaring the buyers in default without giving them reasonable notice that the time prescribed for payment would in the future be insisted upon.

In this case, defendant agreed to "go along" with the plaintiffs until they could raise the money to proceed with the sale. In effect, defendant agreed to keep his offer open upon the terms agreed upon by the parties. Plaintiffs continued to pay rent and expressed a willingness to proceed as soon as it was financially feasible. The February, 1978, memorandum establishes that the offer was still open when plaintiffs accepted.

[543]

Although there were a few details yet to be worked out, the option agreement and February, 1977, modification express an agreement, complete as to material terms and sufficiently definite to render it specifically enforceable. *David M. Scott Construction v. Farrell,* 285 Or 563, 571-72, 592 P2d 551 (1979). It follows that defendants were not at liberty to demand terms other than those set forth in the option, including the "list-back" provision. *Doughty Appliance, Inc. v. Pruitt,* 282 Or 757, 761, 580 P2d 186 (1978). It also follows that the attempt to terminate the option was ineffective.

Affirmed.

**BUTTLER, J.,** specially concurring.

Although I concur with the majority decision, I do so because I think the evidence supports the conclusion that plaintiffs exercised the option, as orally extended, in accordance with its terms, by paying $5000 pursuant to the option agreement, as orally extended.

The oral extension was for an indefinite time, and defendants could have terminated it at any time by notifying plaintiffs. However, defendants did not do so until after plaintiffs had exercised the option. In my view, that is the end of the case.