**LOCAL 3–7, INTERNATIONAL WOODWORKERS OF AMERICA, Plaintiff,**

**v.**

**DAW FOREST PRODUCTS CO., Defendant.**

**Civ. No. 85–782–PA.**

United States District Court, D. Oregon.

May 1, 1986.

Lynn-Marie Crider, Western States Regional Council No. 3, Intern. Woodworkers of America, Gladstone, Or., for plaintiff.

Norman J. Wiener, Miller, Nash, Wiener, Hager & Carlsen, Portland, Or., for defendant.

## OPINION

PANNER, Chief Judge.

Plaintiff Local 3–7 of the International Woodworkers of America (Union) brings this action against defendant DAW Forest

Products Co. (Company) for breach of an alleged contract, pursuant to section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185. Trial was to the court. I find for the Company.

## STANDARDS

■ The Union has the burden of proving its factual allegations by a preponderance of the evidence. To meet this burden, the Union must show that the parties entered into an enforceable contract, and that the Company breached it. Because the Union brings this action pursuant to section 301, I look to federal substantive law regarding labor contracts. I am also guided by state common law of contracts to the extent that this law is compatible with federal labor policy. *Rehmar v. Smith*, 555 F.2d 1362, 1368 (9th Cir.1976).

■ In a Findings and Recommendation dated October 7, 1984, Magistrate William Dale found that two central contract provisions were ambiguous. I therefore look to parol evidence to determine the meaning of these terms. Federal courts look to a broad variety of parol evidence when interpreting collective bargaining agreements. The alleged contract here is not a product of collective bargaining. Although there is some question as to whether I should apply the liberal parol evidence rules used to interpret collective bargaining agreements, *cf. Kemmis v. McGoldrick*, 706 F.2d 993, 996 (9th Cir.1983), I adopt the Union's position and consider evidence of bargaining history, contemporaneous discussions, the interpretation given the alleged contract before the dispute arose, and industry practice.

## FACTS

In late 1983, the Company began negotiations with Diamond International Corporation (Diamond). The Company wanted to buy Diamond's sawmill and logging operations in the Bend, Oregon area. Diamond agreed to the sale, which took place in May 1984.

Diamond had collective bargaining agreements with the Union for both the sawmill and the logging employees. This action concerns the logging employees. The logging employees' agreement provided for an hourly rate to most employees, but also provided that the parties would negotiate an incentive pay program for all employees.

In anticipation of the sale of Diamond's operations, Company and Union officials met in October 1983 and again on March 2, 1984. Company officials stated that they did not intend to continue logging operations unless they could be competitive with logging by independent contractors.

At the March 2, 1984 meeting, Hugh Bannister of the Company and Bill Hubbell of the Union drafted a "Memorandum of Agreement." (Ex. A to this Opinion.) The first clause of the Memorandum provides that the Company "agree[d] to consider in good faith, proposals presented by the [Union]" regarding a new working agreement for logging or "woods" employees. The parties understood that the working agreement would create an employee incentive program. The working agreement would also provide for the continuation of Company logging, provided the Company logging operation could perform competitively with independent loggers, and could operate economically and efficiently. The Company was to decide whether proposals for such a working agreement had "merit."

The second clause of the Memorandum provided that if the Company decided the Union proposal did not have merit, the Company would continue the logging operation so long as Company equipment was economically feasible to operate, operable, and safe. When the Company decided that the equipment was inoperative, unsafe, or uneconomical to operate, the Company was to retire the equipment and not replace it.

The third clause provided that as employees became unemployed because of equipment retirement, the Company was to make a reasonable effort to reemploy as many logging unit employees as possible in other Company locations.

Though the alleged agreement is designated a "Memorandum of Agreement" and though Union and Company officials signed it, the parties did not intend it to be a binding contract. Rather, the parties intended to work out an agreement in the future.

On March 7, 1984, Union members in the logging unit met. As minutes from the meeting indicate (Ex. 135), the members authorized Union officials to "look into all aspects" of an incentive program. The members did not give Union officials full authority to enter into a binding contract with the Company. Any working agreement between Company and Union officials therefore had to be ratified by the members.

During the next several months, Company and Union officials engaged in good faith negotiations regarding an incentive program. While the Union's first bona fide proposal might not have been made within the initial time limit set by the Memorandum, the Company waived this requirement and continued the negotiations. The parties were unable to reach agreement.

In March 1985, Company staff informed management that the Company should spend $865,000 on major repairs and replacement of Company logging equipment, in the interest of safety and efficiency. Company management then decided that continued Company logging could not be competitive with independent logging, and decided to end Company logging operations.

On March 21, 1985, the Company notified the Union of its decision. The next day, the Company layed off sixty-two of sixty-eight logging employees. The Company made reasonable efforts to reemploy these workers, but thirty-three remain layed off.

## DISCUSSION

■ The Memorandum is not an enforceable contract. The Union argues that the agreement is enforceable as an "agreement to agree." Agreements to agree are often found unenforceable either because they lack consideration, or are so vague as to be unenforceable. Here, the key terms of the agreement are simply too vague.

■ To be enforceable, contracts must define the nature and extent of the obligations of each party with reasonable certainty. *Klimek v. Perisich*, 231 Or. 71, 78–79, 371 P.2d 956 (1962). The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy. RESTATEMENT (SECOND) OF CONTRACTS § 322(2) (1981) (RESTATEMENT). Preliminary negotiations often lack this certainty.

Frequently agreements are arrived at piecemeal, different terms and items being discussed and agreed upon separately. As long as the parties know that there is an essential term not yet agreed on, there is no contract; the preliminary agreements on specific items are mere preliminary negotiation building up the terms of the final offer that may or may not be made.

. . . .

Further illustrations are found in the cases of a so-called contract to make a contract. It is quite possible for parties to make an enforceable contract binding them to prepare and execute a subsequent documentary agreement. In order that such may be the effect it is necessary that agreement shall have been expressed on all essential terms that are to be incorporated in the document. That document is understood to be a mere memorial of the agreement already reached. If the document or contract that the parties agree to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called "contract to make a contract" is not a contract at all.

1 A. CORBIN, CONTRACTS § 29 (1963). *See also* RESTATEMENT § 26.

■ The first clause of the Memorandum does not meet these standards. The major terms of the working agreement are never mentioned. The Union argues that the Company was bound to consider Union

proposals in good faith, and that this one requirement was sufficient to create a binding contract. I disagree. Every contract contains an implied covenant of good faith and fair dealing. *Perkins v. Standard Oil Co.*, 235 Or. 7, 16, 383 P.2d 107 (1963). The issue here is whether there was even a contract to which such a covenant could attach. This depends on the certainty of the terms in the Memorandum.

There is no basis in the Memorandum for determining whether the Company gave the Union's proposals good faith consideration. The Memorandum provides only that the Company should give good faith consideration to whether Union proposals have merit. Merit is to be determined by whether Company loggers can operate economically and efficiently, and be competitive with independent loggers. The Company has too much discretion for these terms to be enforceable, especially given the circumstances here. The parties had never negotiated an incentive program, and had no history by which they could judge the company's decisions. Too many essential terms are left undefined. The type of incentive program is never mentioned. Terms of compensation remain a mystery, as do allocation of overhead and expenses between Company and independent logging, division of jobs between Company and independent loggers, and several other crucial matters.

There is also no basis for determining an appropriate remedy. The Union agrees that the court does not have the ability to fashion an incentive program for the parties, but instead requests that I order the parties back to the bargaining table. This course would be futile. Given my inability to determine whether a breach occurred and what remedy to fashion, the first clause fails for lack of reasonable certainty.

Given the lack of certainty in the first clause, the entire Memorandum fails as a contract. *Cf.* RESTATEMENT § 184 (if *nonessential* promise in agreement is unenforceable on public policy grounds, rest of agreement may still be enforceable).

The second and third clauses, dealing with equipment and employee retirement, are dependent on the first clause, in that they take effect only if the parties are unable to reach a working agreement on an incentive program. The first clause is an essential part of the alleged contract. Thus the entire contract fails because of the lack of certainty in the first clause.

Even if the second and third clauses were severable from the first, the Union would not be entitled to recover.

The second clause suffers from the same uncertainty as the first. The Union contends that the second clause required a piecemeal phase-out of logging operations, and that the Company violated this by its wholesale shutdown. I disagree.

As Magistrate Dale found, the contract is ambiguous on this issue. The Company argues that the second clause provides that it could retire "logging equipment," which refers to all equipment rather than only some of it. The Union points to the third clause, which provides that the Company would attempt to reemploy loggers as "each employee becomes unemployed as a result of the retirement of said equipment," which indicates a piecemeal phase-out. The second clause also provides that Company could retire equipment it felt was "inoperative, unsafe, or uneconomical to operate." "Unsafe" and "inoperative" appear to refer to individual pieces of equipment. "Uneconomical to operate," however, could refer to either individual pieces of equipment, or to the equipment collectively.

The parol evidence does not resolve this ambiguity. Union officials present at the March 2 meeting recall that Roger Bannister, the Company representative that helped write the Memorandum, described the second clause as requiring a "piecemeal" phase-out. Bannister's statements that the Company could proceed in piecemeal fashion did not preclude it from deciding on a wholesale shutdown. Parol evidence presented by the Company shows that the loss of one or more key pieces of equipment could make the entire operation

uneconomical to operate. Given the ambiguity here, the Company had broad discretion under the Memorandum regarding equipment retirement.

There is a lack of reasonable certainty in the second clause, which prevents me from determining whether a breach occurred here. Even if the second clause were severable, I would find it unenforceable.

The third clause is not enforceable. It is dependent on the first and second clauses, which are essential to the contract. If they are unenforceable, then the entire contract fails. Even if the third clause were enforceable, however, the Company did not violate it. The Company made reasonable efforts to reemploy layed off workers. There is no evidence to the contrary.

## CONCLUSION

The Union's claims are dismissed. This opinion constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## EXHIBIT "A"

### MEMORANDUM OF AGREEMENT

The following agreement by and between IWA Local Union No. 3–7 and the D.A.W. Company Employer at its Oregon Lumber Division, Bend Oregon, concerning the woods employees covered by the provisions of the Bend Woods Labor Agreement:

(1) The D.A.W. Company Employer agrees to consider in good faith, proposals presented by the International Woodworkers of America relative to a new "Working Agreement" effecting the woods employees referred to above. Said agreement to provide for the continuation of company logging, provided such "Working Agreement" is based on the ability of said logging unit to perform in a competitive basis with area Contract Loggers and can operate economically and efficiently. The Employer will consider the Union proposal which is to be submitted to the Employer within two (2) weeks following the signing of this agreement. If in the opinion of the Employer the proposal has merit, further discussions will be conducted within an additional two (2) weeks. Should the parties agree to a new "Working Agreement," such agreement will become effective immediately and continue to June 1, 1986.

If the Employer determines the proposal is without merit, the following procedure will take effect immediately:

(2) So long as the existing Company logging equipment remains operable, it is economically feasible to operate and can safely be utilized for logging, the Company will continue to maintain the operation. When in the opinion of the Company, the logging equipment is determined to be inoperative, unsafe or uneconomical to operate, it shall be retired and will not be replaced by the Company.

(3) As each employee becomes unemployed as a result of retirement of said logging equipment, the Company will make a reasonable effort to re-employ as many as possible of the qualified displaced logging employees in entry level jobs that occur in other operations of the Employer in the Bend-Redmond, Oregon area, consistent with the existing Collective Bargaining Agreements at said operations.

D.A.W. COMPANY  IWA LOCAL UNION NO. 3-7

BY *Ken N Hansen*  BY *Phillip L Douglas*

BY *Hugh O. Bennett*  BY *Bert R. Larson, Pres.*
        Consultant

Signed *March 8, 1984*
        Date